UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


Susan P. Asmo,

      Plaintiff,

-V-                              Case No. 2:03-cv-0156
                                       JUDGE SMITH
                                       Magistrate Judge KIng

Keane, Inc.,

      Defendant.


## OPINION AND ORDER

Plaintiff asserts that defendant terminated her employment because she was pregnant, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended by the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k), and analogous provisions of Ohio Rev. Code Chapter 4112.  Defendant moves for summary judgment (Doc. 39).  For the reasons that follow, the Court grants defendant's summary judgment motion.


### I.  Background

Plaintiff Susan P. Asmo is a female citizen of the United States.  She resides in Delaware County, Ohio.  Plaintiff was an

1

employee of defendant Keane, Inc. ("Keane").

Keane is a Massachusetts corporation authorized to do business in the State of Ohio.  Keane provides information technology ("IT") and business consulting services for corporations, governmental entities, and healthcare facilities. Headquartered in Boston, Keane operates through a network of branch offices throughout the United States and abroad.  Keane employs technical consultants who provide IT-related services to Keane's clients.

Plaintiff began working for Keane as a Selling, General and Administrative ("SG&A") Recruiter on February 5, 2001.  An SG&A recruiter recruits employees for Keane's non-technical sales and high-level management positions.  When Keane hired plaintiff, three other SG&A Recruiters had been working for Keane since 1998: Valerie Shea, Thomas Becker, and Christopher Hanson.  Keane also hired Jennifer Bowman on February 5, 2001 to work as an SG&A Recruiter.

Plaintiff worked out of a home office in Columbus, Ohio. She reported to Keane's Director of Corporate Recruiting, Scott Santoro, at Keane's headquarters in Massachusetts.

The SG&A Recruiters worked as a team. Keane, however, assigned each SG&A Recruiter to cover a specific region within

2

Keane's North America branch operations. Keane assigned plaintiff to its Midwest region, which included branch offices in Columbus, Pittsburgh, Chicago, Minneapolis, Milwaukee, Indianapolis, and Detroit. Group Vice President Gary Gindele managed Keane's Midwest region.

In mid-2001, Keane decided to acquire Metro Information Services, Inc. ("Metro"), another IT company similar to Keane. Keane expected to achieve significant operational leverage from the acquisition by combining Keane and Metro branch offices in the same markets and by eliminating duplicate functions.

The terrorist attack on September 11, 2001 precipitated an unanticipated slowdown in the economy in general, and the IT industry in particular. Keane experienced a sharp downturn in its business during this period.

Also on September 11, 2001, plaintiff learned that she was pregnant with twins. Although there is some dispute as to the exact time, plaintiff avers that around Halloween 2001, she told the entire SG&A team during a conference call that she was pregnant. Santoro says that he first learned about plaintiff's pregnancy during a team conference call in early October 2001. Plaintiff asserts that although other SG&A recruiters congratulated her, Santoro was silent:

3

> Mr. Santoro made no comment whatsoever, either congratulations, or asking questions, or any other comment or response to my announcement that I was pregnant with twins.  In fact, he was silent, and then after the congratulations ended, he simply moved on to the next business topic in the conference call.

Asmo Aff. ¶ 5.

In November 2001, near the time the Metro acquisition was completed, Keane's Vice President of Human Resources, Renee Southard, directed Santoro to reduce the number of recruiters in his staff.  As a result, Keane eliminated one SG&A position, two Sourcing Specialist positions, and about thirty other recruiter positions.

Santoro maintains that he considered three factors in determining which of the five SG&A Recruiters Keane would lay off: (1) relative tenure; (2) the number of hires each SG&A Recruiter had in 2001; and (3) the forecasted hiring needs for 2002.  Santoro indicates that he did not compare or review performance of the SG&A Recruiters because he considered all of them to be "solid performers."

Plaintiff and Jennifer Bowman had the least tenure of all of the SG&A Recruiters – less than one year.  The other three SG&A Recruiters each had about three years of tenure.  Of the five SG&A Recruiters, plaintiff had the fewest hires for 2001.

Santoro had regular conversations with Keane's Group

4

Vice Presidents to obtain knowledge of the anticipated SG&A hiring needs for the upcoming year. Midwest Group Vice President Gary Gindele told Santoro that the Midwest region's hiring activity for the balance of 2001 would be diminished, and that he did not plan to make any new hires or add headcount in 2002. With respect to the Western region where Jennifer Bowman was assigned, Vice President Gary Richard indicated to Santoro that the Western region was growing and that Bowman was an integral part of its growth and success. Santoro did not refer to any formal written forecasts, however, because apparently none existed.

Santoro decided to lay plaintiff off. Keane states that Santoro did so, in accordance with the three factors identified above, because plaintiff had the least tenure, the lowest number of hires, and Gindele had predicted little need for SG&A hiring in the Midwest region in 2002.

On December 4, 2001, Santoro informed plaintiff that she was being laid off. Plaintiff asserts that when Santoro told her she was being laid off, he mentioned, "Your expenses are a lot more expensive than the other recruiters," and that another reason she was being terminated was that her salary was a lot higher than other recruiters. Plaintiff also says that another

5

reason Santoro gave was that plaintiff did not get the "face time" that other recruiters got.  In his deposition, Santoro stated that salary played no role in his decision-making process, and that he did not keep track of expenses.  Santoro avers that during his conversation with plaintiff, plaintiff offered to take a salary reduction to retain her job, and that he then told her that the layoff was not about salary.  Plaintiff recalls that Santoro also mentioned number of hires and tenure as reasons for her layoff.

Keane maintains that it did not fill plaintiff's position following plaintiff's termination.  Rather, Keane contends that when hiring needs arose in the Midwest region, Santoro gave the assignment to whichever recruiter was available.  Plaintiff asserts that Keane replaced her with  Thomas Becker or Mary Alice Alemendinger.

## II.  Summary Judgment

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment will not lie if the dispute about a material

6

fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, and must refrain from making credibility determinations or weighing the evidence.  *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150-51 (2000).[1]   The Court disregards all evidence favorable to the moving party that the jury would not be not required to believe.  *Id.*  Stated otherwise, the Court must credit

---

[1]  *Reeves* involved a motion for judgment as a matter of law made during the course of a trial under Fed. R. Civ. P. 50 rather than a pretrial summary judgment under Fed. R. Civ. P. 56. Nonetheless, standards applied to both kinds of motions are substantially the same.  One notable difference, however, is that in ruling on a motion for judgment as a matter of law, the Court, having already heard the evidence admitted in the trial, views the entire record, *Reeves,* 530 U.S. at 150.  In contrast, in ruling on a summary judgment motion, the Court will not have heard all of the evidence, and accordingly the non-moving party has the duty to point out those portions of the paper record upon which it relies in asserting a genuine issue of material fact, and the court need not comb the paper record for the benefit of the nonmoving party.  *In re Morris,* 260 F.3d 654, 665 (6th Cir. 2001). As such, *Reeves* did not announce a new standard of review for summary judgment motions.

evidence favoring the nonmoving party as well as evidence favorable to the moving party that is uncontroverted or unimpeached, if it comes from disinterested witnesses. *Id.*

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby*, *Celotex*, and Matsushita have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1476 (6th Cir. 1989). The court in *Street* identified a number of important principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

Additionally, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (quoting *Liberty Lobby,* 477 U.S. at 257). The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita*, 475 U.S. at 586).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* at 1479-80. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *In re Morris,* 260 F.3d 654, 665 (6th Cir. 2001).

### III. Discussion

### A. Prima facie case

"Like any Title VII case, a pregnancy discrimination claim in which the plaintiff does not claim to have direct evidence of the discrimination is analyzed under the *McDonnell Douglas* evidentiary framework." *Prebilich-Holland v. Gaylord Entm't. Co.*, 297 F.3d 438, 442 (6th Cir. 2002). The Sixth Circuit has explicitly stated the manner in which parties should generally approach the *McDonnell Douglas* framework, and more specifically, the slight variations that exist in a pregnancy discrimination context. *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-63 (6th Cir. 1999). First, a claimant must establish a prima facie case. *Id*. The prima facie case in the Sixth Circuit for pregnancy discrimination requires a plaintiff to prove: "(1) she was pregnant; (2) she was qualified for her job; (3) she was subjected to an adverse employment decision; and (4) there is a nexus between her pregnancy and the adverse employment decision." *Prebilich-Holland*, 297 F.3d at 442 (quoting *Cline*, 206 F.3d at 658). In the alternative to the nexus requirement, she may prove that "a comparable non-protected person was treated better."

9

*Ensley-Gaines*, 100 F.3d at 1224.

Here, it is not disputed that plaintiff was pregnant, that she was qualified for the position of SG&A Recruiter, and that she was subjected to an adverse employment decision.  Plaintiff has fulfilled the first three elements of a prima facie case of pregnancy discrimination. The Court will proceed to examine whether plaintiff has satisfied the fourth element.

Plaintiff argues that she has met the nexus requirement as a result of the temporal proximity between the announcement of her pregnancy and the termination of her employment.  Plaintiff contends that temporal proximity of a month or so raises an inference of discrimination.  For this proposition, plaintiff relies on authority from the Southern District of New York.  *See Smith v. K & F Indus., Inc.,* 190 F. Supp.2d 643, 649 (S.D.N.Y. 2002); *Flores v. Buy Buy Baby, Inc.,* 118 F. Supp.2d 425, 430-31 (S.D.N.Y. 2000).

The court in *Flores* concluded:

[T]he circumstances of plaintiff's discharge are sufficient to give rise to an inference of discrimination. In November or December, just after she satisfactorily completed her probationary period, Flores told LaBella of her pregnancy and her intention to take maternity leave in January or perhaps later. She was fired in late December. The temporal proximity of these events is adequate to raise an inference of discrimination. *See Klausner v. Industrial Risk Insurers, Inc.*, No. 98 Civ. 1267, 1999 WL 476285 (July 8, 1999, S.D.N.Y.)

10

118 F. Supp.2d at 430-31.

Keane argues that temporal proximity alone does not establish a nexus between plaintiff's pregnancy and her termination. For this proposition Keane relies on decisional law from the Sixth Circuit Court of Appeals to the effect that temporal proximity, by itself, is insufficient to establish causation for purposes of a retaliation claim. *See Little v. B.P. Exploration & Oil Co.,* 265 F.3d 357, 364 (6th Cir. 2001). The rule of the Sixth Circuit, however, cannot be so easily distilled. For example, the Sixth Circuit has expressly stated that there may be circumstances where temporal proximity alone would support an inference of retaliation. *Nguyen v. City of Cleveland,* 229 F.3d 559, 567 (6th Cir. 2000). One Sixth Circuit panel found "[a] time lag of seven months does not necessarily support an inference of a causal link; previous cases that have permitted a prima facie case to be made based on proximity of time have all been short periods of time, usually less than six months." *Purnell v. West,* No. 95-2131, 1997 WL 271751, at * 3 (6th Cir. May 21, 1997). Hence, "in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to

11

arise.'' *DiCarlo v. Potter,* 358 F.3d 408, 421 (6th Cir. 2004)(termination twenty-one days after protected activity constituted indirect evidence of causal connection). In the context of pregnancy discrimination, the Sixth Circuit has held that the plaintiff satisfied the nexus element as a result of temporal proximity where the plaintiff announced her pregnancy on about August 24, 2001, and the defendant demoted her in late October or early November 2001. *DeBoer v. Musashi Auto Parts, Inc.,* No. 04-1067, 2005 WL 434526, at * 3 (6th Cir. Feb. 25, 2005).

Here, although there is some dispute as to the exact time plaintiff informed Keane of her pregnancy, the time between plaintiff's announcement of her pregnancy and her termination appears to have been less than two months. The Court finds that the close proximity satisfies the nexus requirement for purposes of establishing a prima facie case of pregnancy discrimination.[2] *See DeBoer,* at * 3.

The Court's inquiry into the prima facie case does not end here because Keane terminated plaintiff's employment as part of a reduction in force. A prima facie case of discrimination in a

---

[2] Plaintiff argues in the alternative that she satisfies the fourth element of her prima facie case because Keane replaced plaintiff with **Thomas Becker and later Mary Alice Alemendinger,** neither of whom were pregnant. The Court finds, however, that the evidence does not support plaintiff's assertion that either of these individuals replaced plaintiff for purposes of a discrimination claim.

reduction of force case requires proof of the standard elements, as set forth above, as well as "'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'" *Gragg v. Somerset Technical College,* 373 F.3d 763, 767 (6th Cir. 2004)(quoting *Barnes v. GenCorp, Inc.,* 896 F.2d 1457, 1465 (6th Cir. 1990), *cert. denied,* 498 U.S. 878 (1990).  "'The guiding principle [in a reduction of force case] is that the evidence must be sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff because of age' or gender." *Id.* at 767-68.  Hence, the Court must next consider whether plaintiff has adduced additional direct, circumstantial, or statistical evidence tending to indicate that Keane singled her out for discharge because she was pregnant.

The additional evidence plaintiff offers consists of Santoro's reaction to the news that plaintiff was pregnant.  *See Laxton v. Gap, Inc.,* 333 F.3d 572, 584 (5th Cir. 2003)("It is reasonable to infer from Jones's negative reaction to the news of Laxton's pregnancy that she harbored a stereotypical presumption about Laxton's ability to fulfill job duties as a result of her pregnancy.").  According to plaintiff, when she revealed her pregnancy during a telephone conference in October 2001, other

conference participants congratulated her, but Santoro remained silent. Plaintiff asserts that Santoro's silence supports an inference of discriminatory animus. In support of this assertion, plaintiff relies upon authority which indicates that impeachment of a criminal defendant by use of prearrest silence does not violate the Fourteenth Amendment. *Brecht v. Abrahamson,* 507 U.S. 619, 629 (1993); *Jenkins v. Anderson,* 447 U.S. 231, 240 (1980)("Common law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted.").

The Court finds that Santoro's silence does not reasonably give rise to an inference that Santoro felt negatively toward plaintiff's pregnancy. As Keane suggests, there are other explanations for Santoro's silence that do not involve discriminatory intent. For example, Santoro may have felt that others had already adequately expressed congratulations. Alternatively, Santoro may have been eager to turn the attention of the telephone conference to the business matters at hand. In these circumstances, a factfinder would have to engage in speculation to conclude that Santoro's silence was the result of displeasure with plaintiff's pregnancy. In a somewhat different

14

vein, it is not reasonable to infer discriminatory animus from Santoro's mere silence in light of the competing inferences from which discriminatory animus cannot be inferred.  *See Matsushita,* 475 U.S. at 587-88.

For the above reasons, the Court concludes that plaintiff has failed to adduce additional evidence tending to indicate that Keane singled her out for discharge because she was pregnant. As a result, plaintiff cannot establish a prima facie case of pregnancy discrimination in this reduction in force case.  Keane is therefore entitled to summary judgment in its favor.  The Court will nevertheless proceed to examine whether plaintiff can demonstrate that Keane's stated reasons for terminating plaintiff were mere pretext for pregnancy discrimination.


### B.  Pretext

If the plaintiff establishes a prima facia case, then the burden shifts to the defendant to come forward with a legitimate, non-discriminatory reason for the adverse action against the plaintiff. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506-07 (1993); *Texas Dept. of Comm. Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981).  If the defendant comes forward with a legitimate, non-discriminatory reason for its actions, then the burden shifts to the plaintiff to prove that the defendant's proffered reason is a mere pretext for discrimination. *See Hicks,* 502 U.S. at 512, n. 4; *Burdine,* 450 U.S. at 253.  "The nature of the burden that shifts to the defendant

15

should be understood in light of the plaintiff's ultimate and intermediate burdens.  The ultimate

burden of persuading the trier of fact that the defendant intentionally discriminated against the

plaintiff remains at all times with the plaintiff."  *Burdine,* 450 U.S. at 253.

"An employee can show pretext by offering evidence that the employer's proffered

reason had no basis in fact, did not actually motivate its decision, or was never used in the

past to discharge an employee."  *Smith v. Chrysler Corp.,* 155 F.3d 799, 805-06 (6th Cir.

1998).  "In challenging an employer's action, an employee `must demonstrate that the

employer's reasons (each of them, if the reasons independently caused [the] employer to

take the action it did) are not true.'"  *Id.* (quoting *Kariotis v. Navistar Int'l Trans. Corp.,* 131

F.3d 672, 676 (7th Cir. 1997)).

In examining whether the stated reason is pretext, the Court must determine whether

the employer reasonably relied on the particularized facts before it at the time it made the

employment decision.  *Id.* at 807.  The employer is not required to show that it left no stone

unturned; rather, the issue is whether the employer made a reasonably informed and

considered decision before taking the adverse employment action.  *Id.*  The Court should not

blindly accept the proffered reason as honest.  *Id.*  If the employee adduces evidence

establishing that the employer failed to make a reasonably informed and considered

decision, then its decisional process is "unworthy of credence," and any reliance by the

employer on such a process cannot be deemed "honestly held."  *Id.*  at 807-08.

As *Reeves* instructs, the Court considers separate evidence of

pretext along with the evidence supporting plaintiff's prima

facie case in determining whether plaintiff can satisfy her

16

burden.  500 U.S. at 143.

In the instant case, Keane states that Santoro examined three criteria in selecting an SG&A Recruiter for termination in the reduction in force: (1) relative tenure; (2) the number of hires each SG&A Recruiter had in 2001; and (3) the forecasted hiring needs for 2002.  Keane avers that Santoro selected plaintiff for termination because (1) plaintiff and Jennifer Bowman had the least tenure of all of the SG&A Recruiters; (2) of the five SG&A Recruiters, plaintiff had the fewest hires for 2001; and (3) Midwest Group Vice President Gary Gindele told Santoro that the Midwest region's hiring activity for the balance of 2001 would be diminished, and that he did not plan to make any new hires or add headcount in 2002.  The Court finds that Keane has carried its burden of articulating legitimate, non-discriminatory reasons for terminating plaintiff.   The burden therefore shifts to plaintiff to demonstrate that Keane's proffered reasons are pretextual. *See Hicks,* 502 U.S. at 512, n. 4; *Burdine,* 450 U.S. at 253.

### 1.  Inconsistent explanations

Plaintiff advances several arguments in an attempt to show pretext.  First, plaintiff contends that Keane has provided inconsistent explanations of its reasons for selecting plaintiff for

laying her off.  Plaintiff identifies four different times when Keane expressed the reasons for the termination: (1) when Santoro first told plaintiff she was being terminated during a telephone conversation on December 4, 2001; (2) in Keane's official position statement to the Ohio Civil Rights Commission ("OCRC") mailed on April 18, 2002; (3) Santoro's deposition; and (4) in Keane's motion for summary judgment.  Keane maintains that it has consistently stated its reasons for terminating plaintiff and that any additional factors Santoro mentioned during the December 4, 2001 telephone conversation do not give rise to a genuine issue of material fact.

Plaintiff testified that she recalled Santoro telling her the following during the December 4, 2001 telephone conversation:

A.  "The reason that I selected you was because, first of all, your salary is a lot higher than the other recruiters; looking at the number of hires, you have the least amount of hires; and also you don't get the face time that the other recruiters get.  From an expense standpoint, your expenses are a lot more expensive than the other recruiters."

. . . .

Q.  Did he, during this conversation, did he say anything about your length of employment, your tenure at Keane?

18

A.  Yes he did.  He said "Also seniority, you've been here the least amount of time compared to the others."

Asmo Dep. at 102, 103.

On April 18, 2002, Keane mailed its official position statement to the OCRC.  The statement provided as follows:

> None of the SG&A Recruiters were poor performers. Therefore, Mr. Santoro decided to look at the single most important metric – number of hires per recruiter – to determine which recruiter contributed the least. He also reviewed the anticipated hiring needs for each region, to determine which Recruiter's region was expected to have the fewest hiring needs for the coming year.
> The SG&A Recruiters, as a group, hired seventy-seven sales and management employees in 2001.  The complainant hired fewer employees – eleven – than any of the other SG&A Recruiters.  Her assigned region – the mid-western region – was expected to have fewer hiring needs in 2002 than any of the other regions.  Finally, the complainant had less seniority than three of the other four SG&A Recruiters, and the same seniority as the fourth Recruiter.

Santoro Dep., Ex. A.  In his deposition, Santoro testified that he chose plaintiff for termination after looking at the number of hires, tenure, and forecasted needs.  Santoro Dep. Vol. I at 162-63.

Finally, plaintiff notes that Keane avers the following in its motion for summary judgment:

> Mr. Santoro based his layoff decision on what he believed to be the most relevant information.  Ms. Asmo had the least tenure, the lowest number of hires and Mr. Gindele had predicted little need for new

> SG&A hiring in 2002 in the Midwest region. Mr. Santoro's decision was consistent with Keane's Policy on "Layoff and Rehire," which states that "[I]n determining which employees are to be affected by a layoff, consideration should be given to skills, business needs, performance history and employee tenure."

Mot. for Sum. Jmt. at 5.

The last three explanations are consistent. The only variation that exists is with plaintiff's recollection of her telephone conversation with Santoro. Consistent with the other three explanations, plaintiff specifically recalls that Santoro indicated that he selected her for termination because she had the lowest number of hires and the least tenure. Plaintiff, however, also recalls that Santoro mentioned salary, "face time" and expenses as additional reasons for her termination.

The Sixth Circuit Court of Appeals has held on at least two occasions that in some circumstances, inconsistencies in an employer's proffered reasons for an adverse employment action do not give rise to an inference of pretext. *See Ploscowe v. Kadent,* No. 03-4341, 2005 WL 54732, at * 7 (6th Cir. Jan. 6, 2005); *Mitchell v. Detroit Medical Center,* No. 99-1402, 2000 WL 977349, at * 3 (6th Cir. July 3, 2000). In the instant case, the additional reasons Santoro allegedly provided plaintiff during the December 4, 2001 telephone conversation do not directly conflict with the reasons

20

Keane has provided on the others three occasions. Moreover, plaintiff recalls that during the telephone conversation, Santoro expressed reasons for the termination that Keane now relies upon. The Court finds that the additional reasons which plaintiff recalls are no more than a scintilla of evidence, and do not give rise to an inference of pretext.

### 2. Deviation from written standards

Plaintiff next argues that Keane deviated from its own written policy for layoffs when it terminated plaintiff. Keane's written policy states: "[I]n determining which employees are to be affected by a layoff, consideration should be given to skills, business needs, performance history and employee tenure."

### a. Skills and performance

Keane maintains that Santoro considered the skills of all of the SG&A Recruiters; however, Santoro felt that all of the recruiters were good performers and therefore performance was not a basis for comparison. Santoro Dep. at 67, 161. Plaintiff argues that Thomas Becker was a poor performer based upon Quality Service Reviews ("QSRs") and that Becker's cycle time for filling vacant positions was the longest of any SG&A

21

Recruiter.

Plaintiff points to two negative QSRs Santoro received from Keane executives in the region Becker covered.  One rated Becker's performance as "needs improvement."  The other rated SG&A recruiting efforts as "unacceptable."  Santoro testified that he does not use QSRs as a basis for individual performance reviews; rather, he viewes them as "marginally important," and as "a snapshot" of how SG&A Recruiters were viewed as a group.  Santoro Dep. at 124.  Becker's actual performance evaluation, conducted in June 2001, reflected ratings of "achieved expectations" or "exceeds expectations."

Plaintiff also refers to Becker's cycle time for filling vacant positions.  Becker's average cycle time was sixty-three days.  Plaintiff's average cycle time was thirty-three days – the lowest cycle time of all of the SG&A Recruiters.  Keane explains that the disparity is due to the fact that Becker was assigned more difficult, higher level placements than plaintiff.  In 2001 Becker filled more high level positions in six months than plaintiff filled in ten months.  Becker also performed duties beyond those of an SG&A Recruiter: he performed the "SWAT" recruiting role in New York City, and served as the corporate trainer for all new Keane recruiters.

22

In light of the fact that Becker was assigned more difficult, higher level positions than plaintiff, Becker's additional duties, and plaintiff's relatively short tenure, the Court finds that the two QSRs and the disparity between cycle times do not demonstrate that Becker was a poor performer compared to plaintiff.  The Court therefore finds as a matter of law that Santoro exercised reasonable business judgment when he determined that all of the SG&A Recruiters were good performers and that performance was therefore not a helpful basis for differentiating among the SG&A Recruiters.

### b.  Business needs

Keane maintains that Santoro considered its business needs by examining the number of hires for each SG&A Recruiter in 2001, and conferring with the Vice Presidents concerning their 2002 needs.

Plaintiff argues that Santoro considered Keane's past needs by examining the 2001 hires, but failed to consider Keane's future needs.  The record simply does not support this assertion. Rather, it is uncontroverted that Keane's Midwest Group Vice President, Gary Gindele, conferred with Santoro about hiring needs for the remainder of 2001 and 2002.

Plaintiff also points out that the forecasts Santoro obtained were not formal or in writing.  The Court finds that whether the forecasts were formal or in writing is not, in this case, probative of whether it was reasonable for Santoro to have relied upon them.

Plaintiff further suggests that examining the number of hires for 2001 was unfair because the number of hires was outside the control of the individual SG&A Recruiters.  Plaintiff's argument misses the point.  Number of hires was not used to rate performance; rather, it was, along with the forecasts, an indication of Keane's business needs.

### c. Tenure

Plaintiff does not dispute that she, along with Jennifer Bowman, had the least tenure of the SG&A Recruiters.  It is also undisputed that Santoro considered this factor in making his decision to terminate plaintiff's employment.

In sum, the Court finds as a matter of law that Santoro followed Keane's written policy on layoffs when he made his determination to end plaintiff's employment.

### 3.  Replacement

24

Plaintiff argues that Keane replaced her with Thomas Becker.  It is undisputed, however, that Becker continued to perform his duties in the Northeast region when he was working on openings in the Midwest region.  For purposes of establishing employment discrimination, "a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties." *Barnes,* 896 F.2d at 1465.  Inasmuch as Becker continued to perform "other duties," he did not replace plaintiff.

In the alternative, plaintiff maintains that Keane replaced her with Mary Alice Almendinger.  Plaintiff's argument is primarily based upon an out-of-context characterization of an organization chart created in late 2001.  The chart, however, was not specific to SG&A recruiting.  Almendinger's job duties as a recruiting project manager in 2001 and 2002 were significantly different from those of an SG&A Recruiter.  Almendinger did not become an SG&A recruiter until 2003, after Jennifer Bowman left her position as an SG&A Recruiter.

The Court finds as a matter of law that plaintiff has failed to establish that Keane replaced her with either Becker or Almendinger .

#### 4.  Open positions

Plaintiff also questions whether the layoff was required, contending that there were five "solid" open positions in the Midwest region when she was terminated.  The question is not whether a layoff was necessary.  Having four employees do the work previously assigned to five employees following a downturn in business is within the scope of a reasonable business judgment as a matter of law.

#### 5.  Ron Knaur's statement

Plaintiff further contends that a statement by Keane's Regional Vice President Ron Knauer supports an inference of discrimination.  Following her termination, plaintiff contacted Knauer for support and advice.  Plaintiff told Knauer that she was seeking legal counsel because she believed she was laid off because she was pregnant.  Plaintiff asserts that Knauer responded, "I don't blame you, Susan.  You do [what] you need to do."

Plaintiff has not presented any evidence to suggest that Knauer was a decision maker or for that matter involved in any way with the layoff process that led to plaintiff's termination. The Court finds as a matter of law that Knauer's vague

26

statement of support to plaintiff does not give rise to an inference of pregnancy discrimination on the part of Keane.

Viewing the evidence in the light most favorable to plaintiff, and considering the evidence of plaintiff's prima facie case of pregnancy discrimination along with the other evidence plaintiff submits, the Court concludes that plaintiff cannot, as a matter of law, establish that Keane's stated reasons for terminating her employment were a mere pretext for pregnancy discrimination.  For this additional reason, Keane is entitled to summary judgment in its favor.

## IV.  Disposition

Based on the above, the Court **GRANTS** defendant's summary judgment motion  (Doc.  39).

The Clerk shall enter final judgment in favor of defendant, and against plaintiff, dismissing this action in its entirety with prejudice.

The Clerk shall remove this case from the Court's pending cases and motions lists.

The Clerk shall remove Doc.  39 from the Court's pending motions list.

**IT IS SO ORDERED.**

                                   **/s/ George C. Smith**                
                                  **GEORGE C. SMITH, JUDGE**
                                  **UNITED STATES DISTRICT COURT**